UNITED STATES of America,
Plaintiff–Appellee,

v.

Katherine Ann MITCHELL,
Defendant–Appellant.

No. 94–6478.

United States Court of Appeals,
Sixth Circuit.

Argued June 13, 1995.

Decided Oct. 24, 1995.

Joseph C. Murphy, Jr., Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Memphis, TN, for plaintiff-appellee.

Robert C. Brooks (argued and briefed), Office of the Federal Public Defender, Memphis, TN, for defendant-appellant.

Before: KEITH and BATCHELDER, Circuit Judges; ROSEN, District Judge.*

ROSEN, D.J., delivered the opinion of the court, in which KEITH, J., joined. BATCHELDER, J., concurred in the result only.

ROSEN, District Judge.

Defendant/Appellant Katherine Ann Mitchell appeals her conviction on one count of possession with intent to distribute crack cocaine. For the following reasons, we affirm.

## I.  INTRODUCTION

Defendant Katherine Ann Mitchell was charged in a three-count indictment with one count of possession with intent to distribute marijuana (Count I) and two counts (Counts 2 and 3) of possession with intent to distribute crack cocaine. Following a trial in the Western District of Tennessee, the jury returned a verdict of not guilty on the marijuana charge (Count 1), as well as on one of the

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

crack cocaine counts (Count 2), but guilty on Count 3.

During its deliberations, the jury sent a note to the District Court Judge, which asked "Can entrapment be applied to one count and not to others: Re: paragraph one, page 23." [Tr. p. 456]. The District Court answered this in the affirmative, and counsel for the government agreed. The defense counsel objected because he felt the question was ambiguous and therefore wanted time to research the question. The district court rejected defense counsel's arguments, and sent a signed note back to the jury stating simply: "Members of the jury: Yes." [Tr. 459].

Mitchell now appeals, claiming the District Court erred in giving this response to the jury's question.

## II. FACTUAL BACKGROUND

Estella Carr was a paid informant for the United States Postal Inspection Service. From December of 1992 until January of 1994 she worked as a mail handler at the bulk mail center in Memphis, Tennessee. Carr represented herself as a drug dealer to other employees at the center. As an informant, Carr was under instructions not to pressure someone into a drug deal. If a person was not interested, Carr was to "bow out".

While working at the bulk mail center, Carr became acquainted with the defendant, Katherine Ann Mitchell, who also worked at the center. Carr eventually asked Mitchell if she knew anyone who could supply her with drugs because her contacts had dried up. Mitchell said she would check around. However, she cautioned Carr, "You have to be careful because they have so many undercover postal inspectors out here in this place." [Tr. p. 237].

Mitchell eventually told Carr she could get some marijuana, and a transaction was subsequently arranged for May 4, 1993 at Mitchell's house. Carr, accompanied by her husband, went to Mitchell's house on the specified date. When Carr arrived, a party was taking place at which people were smoking marijuana. Carr testified that Mitchell was offering marijuana to her guests and, in fact, offered some to her. No sale occurred at this time because the defendant said her supplier had not yet given her the marijuana for Carr. Carr testified that she left the party soon thereafter because she felt pressured by Mitchell to smoke marijuana.

### Count 1: The May 15, 1993 Marijuana Transaction

Sometime after the May 4, 1993 party incident, while Carr and Mitchell were at work, Mitchell informed Carr she had finally obtained some marijuana for her. The two arranged to meet at a Kroger's parking lot on Range Line Road in Memphis, Tennessee on May 15, 1993.

Prior to the meeting with Mitchell, Carr and her husband, who accompanied her to the meeting, were searched by postal inspectors. The inspectors determined Carr and her husband did not have any drugs. Carr was also equipped with a minicassette tape recorder. (In addition to the live testimony of Carr and Mitchell concerning the transaction, the tape was also played at trial.)

Carr and her husband proceeded to the Kroger's parking lot where they met Mitchell. Carr gave Mitchell $700 in exchange for a half pound of marijuana. While the transaction was taking place, Carr reminded Mitchell about her previous request for some crack cocaine, as well, which Mitchell had said would take a little while.

### Count 2: The May 25, 1993 Crack Cocaine Transaction

Carr testified that after the May 15 transaction, Mitchell called her on the phone a few times and asked if she needed any more drugs. Ultimately, in one such telephone conversation subsequent to the May 15, 1993 marijuana transaction, Mitchell informed Carr she had obtained some crack cocaine. The two agreed to meet at the same Kroger's parking lot on May 25, 1993. Carr once again was accompanied to the meeting by her husband.

When the transaction took place in the parking lot, Mitchell gave Carr a bag which had one solid rock of crack cocaine which was

supposed to have weighed one quarter of an ounce. Carr paid Mitchell $350 for the crack cocaine. Carr met with postal inspectors shortly after the transaction and turned the crack cocaine over to them. At this time, the crack cocaine was weighed and determined to be one half of the agreed upon amount.

## Count 3: The May 28, 1993 Crack Cocaine Deal

On May 26, 1993, Mitchell and Carr had a series of telephone conversations concerning another deal. Carr testified that she made the first call to Mitchell during which she advised Mitchell that her May 25th purchase turned out to be only one half of the agreed-upon amount and that she wanted to buy some more. The two again agreed to meet at the same Kroger's parking lot on May 28, 1993. At the transaction, Mitchell gave Carr 22 rocks of crack cocaine, for which Carr paid $350. Carr testified that, as the transaction was being completed, Mitchell said that before coming to the parking lot she had almost sold some of the 22 rocks to someone else. The entire transaction was tape-recorded and the tape of this May 28 deal was played for the jury. Carr further testified that Mitchell never refused to deal with her and never showed any reluctance over the selling of drugs.

Mitchell asserted entrapment as a defense. As evidence of her defense, Mitchell offered the testimony of Paul Williams who said he had known Mitchell since 1980 and that he and Mitchell had lived together since 1988. He stated that Mitchell was his fiancee. Williams also testified that Mitchell used crack cocaine and marijuana, but he said he had no reason to believe she sold drugs.

Mamie Anderson also testified for the defense. She testified she and Mitchell had used marijuana and crack cocaine in the past, but that she had never known Mitchell to sell drugs.

The defendant, Katherine Ann Mitchell, also testified. She said she had never been convicted of a crime and had never sold drugs, except to Carr. She further testified the reason she sold drugs to Carr was to help her out. She said that Carr had represented to her that she had been off work for an extended period of time due to illness, and due to her illness, her drug business was suffering because she lost contact with her suppliers and was having a hard time finding new suppliers. Mitchell said she knew an individual who she knew could obtain drugs, so she bought drugs from this person on Carr's behalf. Mitchell testified she made no money from these sales because the money just passed through her hands. (Mitchell also contended she was badgered by Carr into selling her the drugs.)

## The Jury's Question

The District Court gave, as part of its charge to the jury, entrapment instructions. The full jury charge on entrapment given by Judge Horton was as follows:

One of the questions in this case is whether Mrs. Mitchell was entrapped with respect to possession with intent to distribute cocaine base or marijuana. Entrapment has two related elements. One is that the defendant was not already willing to commit the crime. The other is that the government or someone acting for the government induced and persuaded the defendant to commit it. .

If the defendant was not already willing to commit the crime prior to first being approached by government agents, and the government persuaded her to commit it, that would be entrapment. But if the defendant was already willing to commit the crime, it would not be entrapment, even if the government provided her with a favorable opportunity to commit the crime, or made the crime easier, or participated in the crime in some way.

It is sometimes necessary during an investigation for a government agent to pretend to be a criminal and to offer to take part in a crime. This may be done directly or the agent may have to work through an informer or a decoy. This is permissible and without more is not entrapment. The crucial question in entrapment cases is whether the government persuaded a defendant who was not already willing to commit a crime prior to first being approached by government agents to go ahead and commit it.

The government has the burden of proving beyond a reasonable doubt that the defendant was already willing to commit the crime prior to first being approached by government agents.

Let me suggest some things that you may consider in deciding whether the government has proved this.

Ask yourself what the evidence shows about the defendant's character and reputation.

Ask yourself if the idea of committing the crime originated with or came from the government.

Ask yourself if the defendant took part in the crime for profit.

Ask yourself if the defendant took part in any similar criminal activity with anyone else before or afterwards.

Ask yourself if the defendant showed any reluctance to commit the crime, and if she did, whether she was overcome by government persuasion.

And ask yourself what kind of persuasion and how much persuasion the government used.

Consider all the evidence and decide if the government has proved that the defendant was already willing to commit the crime prior to first being approached by government agents. Unless the government proves this beyond a reasonable doubt, you must find Mrs. Mitchell not guilty with respect to the charges concerning the possession with intent to distribute a controlled substance.
[Tr. pp. 441–442].

The jury was also instructed to consider the Defendant's guilt or innocence as to each separate count of the indictment. Specifically, the jury was charged:

A separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you might find an accused guilty or not guilty as to any one of the offenses charged should not control your verdict as to any other offenses charged.
[Tr. p. 431].

Neither the Defendant, nor the Government objected to any of the jury instructions. *Id.*

After the jury began deliberations, the court received the following note from the jury:

"Can entrapment be applied to one count and not to others: Re: paragraph one, page 23." [T.: Court, p. 456].[1]

The district court said it believed the answer to the jury's question was "yes," and the government agreed. The defense counsel objected because he felt the meaning of the jury's question was unclear and the reference to page 23 of the charge ambiguous. He asked the court to delay responding to the question and requested additional time to research the matter, but the court refused, and instead simply answered "yes" to the jury's question.[2]

1. Page 23 of the jury charge referred to in the jury's question contained the following portion of the instructions on entrapment:

The government has the burden of proving beyond a reasonable doubt that the defendant was already willing to commit the crime prior to first being approached by government agents.
Let me suggest some things that you may consider in deciding whether the government has proved this:
Ask yourself what the evidence shows about defendant's character and reputation.
Ask yourself if the idea of committing the crime originated with or came from the government.
Ask yourself if the defendant took part in the crime for profit.

Ask yourself if the defendant took part in any similar criminal activity with anyone else before or afterwards.
Ask yourself if the defendant showed any reluctance to commit the crime and, if he did, whether he was overcome by government persuasion.
Ask yourself what kind of persuasion and how much persuasion the government used.

2. Defendant's counsel opined:
I think the clear import of this [question,] or at least my reading of [it,] the very clear import of [it] is that they are considering the possibility of finding entrapment on the first count but then convicting on the second and third counts. I would strongly urge the court that because of the very close time span in which these events happened that to simply say [yes, may be just too simple an] answer and ask the

The jury subsequently found the defendant not guilty as to Counts 1 and 2 of the indictment, which related to the transactions on May 15 and 25, 1993, respectively. The jury convicted Mitchell of Count 3, which arose from the May 28, 1993 transaction.

Defendant now appeals her conviction relying solely on the District Court's simple "yes" response to the jury's question concerning paragraph 1 of page 23 of the entrapment instructions, i.e., "The government has the burden of proving beyond a reasonable doubt that the defendant was already willing to commit the crime prior to first being approached by government agents," and whether it could apply to one count, but not the others.

## III. DISCUSSION

### A. STANDARD OF REVIEW

■ A district court's actions in responding to questions from the jury, and supplemental instructions given to the jury by the district court are reviewed for abuse of discretion. *United States v. August*, 984 F.2d 705, 712 (6th Cir.1992), *cert. denied*, — U.S. ——, 114 S.Ct. 158, 126 L.Ed.2d 119 (1993) (court's actions in responding to jury questions are reviewed for abuse of discretion); *United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir.1989) (court must exercise sound discretion in determining what type of supplemental instructions should be given to the jury).

### B. DEFENDANT'S "COURSE OF CONDUCT" THEORY

Defendant's argument essentially is that the judge erred in his supplemental instruction to the jury. She contends that the jury should have been instructed that they should treat the separate drug transactions as having occurred under a single "course of conduct" so as to mandate a determination that entrapment as to the earliest of the transactions necessitates a finding of entrapment as to the later transactions, as well.

The issues presented in this case have been squarely addressed by the Second and

court for more time to look into that and perhaps give them a more informative answer.

the Ninth Circuit (as well as by the Sixth Circuit, albeit in an unpublished opinion).

In *United States v. Khubani*, 791 F.2d 260 (2d Cir.1986), *cert. denied*, 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986), the defendant was charged with, and tried on, two counts of bribing an IRS agent. (A third count of conspiracy was dismissed before trial.) The bribery charges stemmed from incidents occurring on October 21 and November 14, 1983.

At trial, Khubani asserted the defense of entrapment. The district judge charged the jury on entrapment, but did not give Khubani's requested instruction which stated that if entrapment were found as to the October 21, 1983 bribe (count 2), then the Government must prove beyond a reasonable doubt that the November 14, 1983 bribe (count 3) was not the result of the first entrapment. *Id.* at 263.

After two hours of deliberations, the jury sent the court a note which read, "If we find Kubani [sic] not guilty because of entrapment on Count # 2, do we have to find him not guilty on Count # 3?" *Id.* After discussing the matter with the attorneys, the district judge responded to the note as follows:

I think I tried to explain to you in my charge that you have to consider each count separately and if you deal with count 2 then you go into count 3 and you consider the facts and the circumstances that you regard were relevant to that count and then make your determination. They have to be dealt with in that way.

\* \* \*

I want you to understand when I said that you can consider the evidence—that they are separate counts—and you consider the evidence relevant—if you reach a conclusion on one count, consider the evidence relevant to the next count. You start separately. What I meant was that you consider all of the evidence that you regard as being relevant and you consider all the evidence that you regard as being relevant

[T. p. 460.]

when you consider any count to the indictment.

*Id.*

Later that day, the jury returned a "not guilty" verdict on the October 21 bribe. *Id.*

The jury returned to deliberations, and the next day, sent the judge a note asking, "If the defendant had predisposition on November 14, 1983, does that preclude defense of entrapment?" *Id.* The judge responded to that question as follows:

If you find, based upon an evaluation of all the evidence, that there was [a predisposition on November 14], of course, it precludes the defense of entrapment. The issue of whether you find the predisposition, you have to look at all the evidence.

*Id.* at 264.

Khubani's counsel noted his exception to this response. Shortly thereafter, the jury found Khubani guilty on the November 14 bribe. *Id.*

■■■ On appeal, Khubani, like Defendant Mitchell in this case, argued that the trial court's supplemental entrapment instructions were erroneous. The Second Circuit rejected Khubani's argument, explaining:

Khubani contends that because the jury found entrapment—and therefore necessarily found no predisposition—as to the October 21 bribe, it is not possible, as a matter of law, to convict him—and thereby implicitly find predisposition—as to the November 14 bribe.

Common sense persuades us that this is too broad. . . . Limiting examination of defendant's state of mind to the period prior to any governmental contact ignores the possibility that the defendant could become predisposed to commit the crime after the government's first contact. A defendant "might well have found [his crime] so profitable and easy that he thereafter willingly continued it, regardless of [the] original inducement." *United States v. North,* 746 F.2d 627, 630 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). We agree with the Ninth Circuit's view that an initial entrapment does not "immunize [one] from criminal liability for subsequent

transactions that he readily and willingly undertook. Whether an initial entrapment extends through a series of crimes is, therefore, not a question of law, but a question of fact for the jury. *Of course the jury should be instructed in cases such as this that they must find as to each alleged offense whether the defendant is guilty beyond a reasonable doubt.* We believe, from consideration of the entire charge and supplemental charge, that the jury was so advised."

791 F.2d at 264–265 (emphasis added).

A similar situation was presented in *United States v. North, supra.* In *North,* the defendant was charged with separate counts of narcotics trafficking predicated upon transactions which occurred on September 17, October 15 and October 26, 1982. North asserted an entrapment defense and the jury was given a standard jury instruction on entrapment. *Id.* at 629.

During its deliberations, the jury asked to rehear the entrapment instruction and specifically asked—as did the jury in our case—whether "entrapment must apply *in toto* or to each individual count." After discussion with counsel, and over North's objection, the court instructed,

One, you may find that defendant North was entrapped in the first instance and therefore all criminal acts following were the subject of the initial entrapment;

Or . . . two, you may find there was no entrapment and therefore none of the acts are subject to the defense of entrapment.

Three, *you may find that there was entrapment as to some of the acts, but no entrapment as to other of the acts.*

These are questions of fact for you to determine.

*Id.* (Emphasis added.) The court also repeated the general entrapment instruction. *Id.*

The jury returned a not guilty verdict on the first count based on the September 17 transaction, but found him guilty on the counts based on the subsequent transactions on October 15 and October 26.

On appeal, North argued, as does the Defendant in this case, that all of the transactions were part of a single course of dealing. He argued that his acquittal of the September 17 sale, to which his only defense was entrapment, implies a finding that he was not predisposed to then sell the drugs. Because the Government did not present any evidence to show that his state of mind had changed after the first transaction, he claimed that an acquittal of the subsequent transactions was mandated, as well.

The Ninth Circuit found no merit in North's argument:

> We do not think that, if North was not initially disposed to sell drugs, he could not, as a matter of law, develop such a disposition during the later course of dealing. He might well have found such dealing so profitable and easy that he thereafter willingly continued it, regardless of [the government informant's] original inducement. Even if the government ... was unable to prove beyond a reasonable doubt that it did not entrap North in the sale on September 17, for which he was not convicted, it is still possible, as a matter of law, that North could have freely decided, during the month that passed before the October sales, to traffic in drugs. The initial entrapment, assuming it existed, did not immunize North from criminal liability for subsequent transactions that he readily and willingly undertook.

> Whether any initial entrapment extended through some or all of the later transactions was a question of fact that the instruction properly left to the jury.

746 F.2d at 630. *See also, United States v. Smith,* 802 F.2d 1119 (9th Cir.1986) (jury found that defendant had been entrapped as to October 23, 1984 drug transaction but convicted him of selling drugs to same undercover agent on December 11, 1984); *United States v. Cruz,* 783 F.2d 1470 (9th Cir.1986), *cert. denied,* 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 987 (1986) (no error in allowing the

jury to find that later sales were independent of initial inducement).[3]

The Sixth Circuit has not addressed this issue in a published opinion. We note, however, that in an unpublished opinion, a panel of this court has held that in circumstances similar to those before us today, the jury should not be precluded from finding that although a defendant was entrapped into committing a first offense, he was not entrapped into committing subsequent offenses. *See United States v. Burke,* 900 F.2d 260, 1990 U.S.App. LEXIS 6411 (6th Cir.1990), *cert. denied,* 498 U.S. 868, 111 S.Ct. 185, 112 L.Ed.2d 148 (1990) (unpublished opinion; text available on LEXIS).

In support of her argument, Defendant in this case relies principally upon *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). *Sherman* is readily distinguishable from the instant action. In *Sherman,* the record evidence was that the government informant did much more than simply ask, more than once, if Sherman could supply him with drugs. Both Sherman and the informer, Kalchinian, were being treated for narcotics addictions. From mere greetings at the doctor's office and at the pharmacy, Kalchinian proceeded to pressing Sherman to supply him with a source of drugs. The evidence showed that from the first, Sherman tried to avoid the issue but Kalchinian repeatedly falsely told Sherman that he was suffering because the addiction treatment was not working. Sherman finally acquiesced and, predicated upon Kalchinian's "suffering", sold him drugs three times in one month. (Not only did Kalchinian succeed in inducing Sherman to get him some drugs but also induced him to return to the drug habit, himself.)

The issue of entrapment went to the jury, and the jury returned a guilty verdict. The court of appeals affirmed. The Supreme Court, however, reversed the conviction and held that Sherman was entrapped. In so doing, the *Sherman* court stated, *in dicta,*

---

**3.** In *Cruz,* the court rejected the defendant's proffered instruction which stated:

If you find that the Defendant was originally entrapped, and that the subsequent offenses by the Defendant were a product of that initial inducement by the Government informant, then you must find the Defendant Robert Cruz not guilty of the charge in the indictment. 783 F.2d at 1472.

"It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement." 356 U.S. at 374, 78 S.Ct. at 822. There was, however, no issue in the case concerning the jury instructions. *See*, 356 U.S. at 372, n. 1, 78 S.Ct. at 820, n. 1. Moreover, the record evidence in *Sherman* revealed a continuous "badgering" of the defendant by the informant, not merely a request to purchase drugs.

■ Here, the sales arranged by Carr were not part of the same course of conduct which was the product of the initial inducement. Rather, the record evidence indicates that the subsequent sales were, at least in part, initiated by the Defendant herself. Furthermore, at the May 28th sale, Defendant was tape-recorded as saying she had almost sold some of the crack cocaine to someone else before the informant arrived. Clearly, the jury could have found this evidence to be indicative of a predisposition which was not causally related to the first "induced" sale.

Defendant's reliance on *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), is similarly misplaced. *Jacobson* involved a 26–month–long mail campaign by customs and postal officials inducing the defendant to purchase illicit child pornographic materials.

During this "mail campaign", the two Government agencies sent Jacobson mail through five fictitious organizations and a bogus "pen pal", to explore his willingness to break the law. The mailings of several of the fictitious organizations represented that they were founded to protect freedom of choice and free speech. Jacobson responded to some of the correspondence, and after 2½ years, he received a catalog for pornographic materials and ordered a magazine depicting young boys engaged in sexual activities. He was arrested after a controlled delivery of the magazine.

Other than the evidence of Jacobson's responses to the Government's mail campaign, the only evidence of the Defendant's predisposition to purchase child pornographic materials was one prior purchase in 1984, a year prior to the commencement of the Government's operation, when the receipt through the mail of child pornography was legal.

The Supreme Court determined that the Government had "overstepped the line between setting a trap for the 'unwary innocent' and the 'unwary criminal'... and that as a matter of law failed to establish that the petitioner was independently predisposed to commit the crime for which he was arrested." 503 U.S. at 542, 112 S.Ct. at 1537.

In rendering its ruling in *Jacobson*, the Supreme Court acknowledged that:

It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.

\* \* \*

Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.

*Id.* at 548–550, 112 S.Ct. at 1540–1541 (citations omitted).

The Court in *Jacobson* found, however, that the Government had gone too far with its mail campaign, explaining:

Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction. (Citation omitted).

But that is not what happened here. By the time petitioner finally placed his order,

he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985.

*Id.* at 550, 112 S.Ct. at 1541.

Defendant in this case apparently believes that *Jacobson* stands for the proposition that the Government's proof of predisposition must be established with evidence obtained prior to its *initial* contact with her. The plain language of *Jacobson* belies this argument.

Furthermore, this Court squarely rejected such an argument in *United States v. Kussmaul,* 987 F.2d 345 (6th Cir.1993), explaining:

> *Jacobson* does not prohibit the Government from inducing bad people to commit crimes; it simply strengthens the requirement that the Government prove that its agents *did not induce the defendant's criminality. Jacobson* requires that where a defendant raises entrapment, the Government prove, beyond a reasonable doubt, that the defendant had the inclination to commit the crime with which he is charged, and that his criminal inclination did not possibly result from the seductions of Government agents.

*Id.* at 349.

*Kussmaul* is similar to the instant case in that the Government agent in *Kussmaul,* like Government informant Carr in this case, had only three "contacts" with the defendant, and Kussmaul, like Defendant Mitchell here, promptly responded to two of those contacts. The *Kussmaul* Court found that this evidence satisfied the requirements of *Jacobson,* and determined that the Government had sufficiently established that it "simply offered the defendant the opportunity" to commit the crime with which he was charged and established that the defendant "possessed the requisite predisposition . . . independent of the

Government's approaches to him." *Id.* at 350.

In sum, the foregoing discussion makes clear that Defendant Mitchell's reliance on *Sherman* and *Jacobson* is misplaced.

Defendant also relies on *United States v. Beal,* 961 F.2d 1512 (10th Cir.1992) and *United States v. Lakich,* 23 F.3d 1203 (7th Cir. 1994). *Beal,* however, does not support Defendant's position in this appeal. Although in that case, the Tenth Circuit affirmed the trial court's finding that three sales of drugs within a 24–hour period were part of the same continuum of events motivated by the same influence, the appellate court expressly rejected the defendant's request for a ruling as a matter of law. The *Beal* court explained:

> Mr. Beal would like us to hold as a general rule that once entrapment occurs, a defendant's subsequent willing acts are immunized from culpability. We are not persuaded to do so. We shall follow this case only as far as it takes us. Suffice, then, that the line ends with the legal conclusion that under the facts of *this* case the original inducement and not the defendant's predisposition provided motive for his otherwise criminal acts.

961 F.2d at 1517.

*Lakich* does not support Defendant's position, either. In *Lakich,* the jury sent the judge a question during deliberations asking whether a finding of entrapment on Count I would "reflect" on Count II. The Seventh Circuit found no error in the district court's response to the question directing the jury to refer back and follow the multiple defendant/multiple count instruction in conjunction with the following supplemental instruction:

> Some evidence may relate to more than one count. Still, you must give separate consideration to each count, considering only the evidence that relates to that count.

23 F.3d at 1206.

## IV. CONCLUSION

Applying the foregoing authorities to the facts in this case, although the "sales" were only each days apart, considering the instruc-

tions given by the district court as a whole, the Court finds no error. Contrary to Defendant's assertions, the jury's question was not ambiguous. Clearly, the jury was asking whether it could deal with each count separately with respect to determining whether the Government had proven beyond a reasonable doubt that the Defendant was already willing to sell drugs. As the authorities discussed above make clear, there was no error in instructing the jury to treat each count separately.

Accordingly, we AFFIRM Defendant Mitchell's conviction.