NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0336n.06
Filed: May 14, 2007

No. 06-3391

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | ON APPEAL FROM THE UNITED |
| ) | STATES DISTRICT COURT FOR |
| LARUE ROLAND, ) | THE SOUTHERN DISTRICT OF |
| ) | OHIO |
| Defendant-Appellant. ) | |
| ) | |
| ) | |

**Before: SUHRHEINRICH and GIBBONS, Circuit Judges; HEYBURN, District Judge.**[*]

**JULIA SMITH GIBBONS, Circuit Judge.** A jury convicted defendant-appellant, Larue Roland, of three counts of unlawful drug possession and distribution. Roland argued at trial that the government used his employer to coerce him into committing the acts forming the basis for his conviction. Following Roland's conviction, the district court sentenced him to 68 months imprisonment. On appeal, Roland contends that the government failed to demonstrate that he was predisposed to engage in criminal activity and that the district court erred in refusing to grant a downward departure under the Sentencing Guidelines. For the reasons below, we affirm.

I.

_____

[*] The Honorable John G. Heyburn II, United States District Judge for the Western District of Kentucky, sitting by designation.

1

On March 24, 2005, a grand jury assembled in the Southern District of Ohio issued an eight-count indictment naming several individuals. The indictment included four counts against Roland, including: (1) conspiracy to distribute over five grams of cocaine base on January 14, 2004, and January 15, 2004; (2) distribution of over five grams of cocaine base on January 15, 2004; (3) conspiracy to distribute over fifty grams of cocaine base on February 20, 2004; (4) distribution of over fifty grams of cocaine base on February 20, 2004; and (5) possession of cocaine on February 20, 2004. On the government's motion, the district court dismissed the first conspiracy count, and Roland proceeded to trial on the remaining counts.

The facts underlying Roland's indictment, as set forth at trial, are as follows. In 2003, Roland gained employment with Gary Hughes doing cosmetic remodeling and flooring work. Unbeknownst to Roland, Hughes had agreed to assist Agent Daniel Ozbolt, of the Bureau of Alcohol, Tobacco, and Firearms, and Explosives, in an investigation aimed at apprehending drug and gun offenders. Hughes met Roland through his brother, Richard Roland, who had worked with Hughes following his release from prison. Richard Roland also introduced Hughes to Clifford Moxley, a friend of the Roland brothers.

At trial, the parties offered differing accounts of the events leading up to Roland's arrest in April 2005. Hughes testified that Larue Roland, Clifford Moxley, and Richard Roland volunteered to secure "ounces," also known as "onions," of crack cocaine for Hughes. Hughes claimed that he immediately contacted Agent Ozbolt, who would be posing in his undercover capacity as an individual with mob connections. Ozbolt instructed Hughes to set up a purchase from Moxley and the Roland brothers. Hughes testified that Larue Roland informed him that his regular supplier was out of town, but that he had access to other individuals who could supply the cocaine. After Moxley

2

and Larue Roland notified Hughes that they had the cocaine and Hughes conveyed this information to Agent Ozbolt, the agent directed Hughes to arrange a meeting.

Hughes claimed that on January 14, 2004, Larue Roland and Moxley came to his home accompanied by Angela Colchin, Roland's then-girlfriend. Hughes and Roland discussed the possibility of arranging a purchase by Ozbolt of an ounce of crack cocaine. On January 15, Roland and Colchin arrived at Hughes's house and met Ozbolt for the first time. Roland explained upon his arrival that he had to contact four individuals to secure the crack cocaine. Roland sold Ozbolt what Hughes testified was slightly less than one ounce, or 28 grams, of crack cocaine for $925.

According to Hughes, Larue Roland and Moxley contacted him again in February 2004 to inform him that they had a connection who would provide a better price on the crack cocaine he sought. On February 20, Roland and Moxley were to meet someone named "Butch"[2] to secure the drugs. Hughes notified Agent Ozbolt, who contacted Roland or Moxley and arranged a second meeting at Hughes's house. Larue Roland, accompanied by Moxley,[3] and Butch arrived at Hughes's house. The men shook hands, laughed, and joked with Hughes and Agent Ozbolt, and Butch produced a bag of crack cocaine. After weighing it, Ozbolt paid between $1800 and $2100 for the drugs, according to Hughes's testimony. Hughes further testified that during the transaction Larue Roland produced what Hughes identified as an ounce of powder cocaine, which he showed to Agent Ozbolt.

The United States also called Agent Ozbolt, who offered testimony consistent with Hughes's

[2]The investigation revealed that "Butch" is Robert Westmoreland, who is named in the indictment charging Roland.

[3]Hughes represented that Moxley was present on February 20 but was willing to concede Moxley was not present if the surveillance videotape produced at trial indicated otherwise.

3

representations. Ozbolt confirmed Hughes's account of the January 15 sale, including Hughes's report of Roland's references to his usual source. Ozbolt testified that Roland informed him that he was unable to obtain the crack cocaine from his "regular source" and had to contact four separate people to secure it. Immediately following the transaction, Roland mentioned getting additional crack cocaine, again not from his regular supplier, but other individuals. He also mentioned having to "make another move." Ozbolt interpreted this remark to mean Roland intended to purchase additional crack cocaine.

According to Ozbolt, Roland contacted him through Hughes on February 17, explaining that he had access to high potency cocaine known as "fish scale." On February 20, Agent Ozbolt had Hughes contact Roland to arrange a second drug purchase. Roland arrived that day at Hughes's residence with Butch and an individual Ozbolt knew as "Joe." Ozbolt testified that Butch produced approximately 66 grams of crack cocaine, which the agent weighed and purchased for $2,000. Shortly thereafter, Roland indicated that he had something to show Agent Ozbolt, left the house, and returned with what Ozbolt believed to be two ounces of powder cocaine. Roland confirmed for Ozbolt that it was the high quality cocaine he advertised during their previous phone call. Roland stated that he would have to contact his supplier to get the correct price, and Agent Ozbolt did not purchase the cocaine. During his testimony, Agent Ozbolt also described Roland's account of a dispute with his girlfriend that resulted in her disposal of his "dope" after she discovered he was romantically involved with another woman. While Agent Ozbolt detailed the purchases of January 15 and February 20, the government played a surveillance video for the jury documenting the events.

There were no further purchases after February 20, 2004. Roland continued to work for Hughes in his subcontracting business until April 2005, when he was arrested. Hughes insisted that

4

throughout the course of Roland's employment, he maintained a "very friendly" relationship with Roland and that Roland was paid for all of the work he actually completed as a subcontractor. On cross-examination, Hughes denied using financial pressure to coerce Roland into engaging in illegal activity.

Testifying on his own behalf, Roland admitted the allegations contained in the indictment, but insisted that he was the victim of government entrapment. According to Roland, in December 2003, approximately two months after beginning work for Hughes, Hughes began falling behind on payments for completed work. Around the same time, Roland alleged, Hughes began repeatedly "pushing real heavy" for Roland and Clifford Moxley to provide him with drugs. Roland initially resisted, despite Hughes's more than twenty requests for Roland's assistance. In January 2004, Roland relented, motivated, he insisted, by Hughes's refusal to pay him the wages to which he was entitled and Hughes's assurance that he would pay Roland if Roland procured drugs for him. Roland also testified that he feared for his safety when Hughes warned him that the individual for whom he was soliciting drugs, Ozbolt, was a violent individual with mob connections.

Roland expressly denied many of the claims made by Hughes and Ozbolt. He asserted that he was not at Hughes's home on February 14 to arrange a drug transaction and denied that he contacted Agent Ozbolt on February 17 to offer him cocaine. Faced with the videotape, Roland explained that his references to his "supplier" and other drug references were part of his attempt to play the part of a drug dealer in order to avoid antagonizing Ozbolt. As for the bag of powder cocaine the video shows him producing, Roland stated that an individual named "Tank" provided Roland with a "sample" and that after the February 20 transaction, he returned that bag to Butch. Roland testified that following the February 20 sale, Hughes continued to ask him to provide him

5

with drugs.

In addition, Roland offered a number of witnesses who testified that Roland had never exhibited an inclination to engage in criminal activity. Those individuals, including his neighbors, co-workers, and relatives, testified to Roland's law abiding nature and work ethic. Colchin, Roland's then-girlfriend and mother of his child, confirmed Roland's claim that Hughes engaged in heavy-handed tactics to pressure Roland to sell drugs. She testified that, in early 2004, Hughes would regularly call the home she shared with Roland. She further testified that Hughes imposed a significant amount of financial stress on Roland by refusing to pay Roland. According to Colchin, she and Roland did not travel to Hughes's home on January 14, 2004.

At the close of the evidence, the court instructed the jury on the substantive counts against Roland and provided it with instructions on the law of entrapment. Following closing arguments and the initiation of jury deliberations, the jury sent out a question: "Question about entrapment – if hypothetically we were to find defendant entrapped on 1 count – would it mean that the defendant was entrapped in all counts – thus not guilty on all counts?" After hearing arguments from counsel, the court issued the following response: "The precise answer to your question is no. Each count is to be considered independently of the others. You should apply the instructions on entrapment to each count."

On September 23, 2005, the jury returned a verdict of guilty on the three counts arising out of the February 20 transaction. The jury failed to reach a unanimous verdict on the remaining January 15 count. On the government's motion, the court dismissed that count. Following the verdict, defense counsel filed two written motions: a motion for judgment of acquittal pursuant to

6

Rule 29 of the Federal Rules of Criminal Procedure,[4] and a motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Roland argued, in essence, that the jury's note to the court during deliberations suggested strongly that its failure to convict on the January 15 count was a result of a finding of entrapment as to that count. He contended that such a finding necessarily required a finding of entrapment as to the February 20 counts and, thus, acquittal.

At sentencing on March 9, 2006, the trial court heard arguments relating to Roland's two motions. Relying on the Sixth Circuit's decision in *United States v. Mitchell*, 67 F.3d 1248 (6th Cir. 1995), the district court denied Roland's motions. The court determined that Roland's sentencing range under the United States Sentencing Guidelines was 78 to 97 months imprisonment, as indicated by the Presentence Investigation Report. That range reflected a two-point reduction in Roland's offense level for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines.[5] The court concluded that although the amount of drugs involved, 66.2 grams, would normally qualify him for a mandatory statutory term of 10 years imprisonment under 21 U.S.C. § 841, the safety valve provision, 18 U.S.C. § 3553(f), permitted a lower sentence in Roland's case. Noting the "financial duress" present, the district court ultimately imposed a sentence of 68 months on the relevant counts, the terms to run concurrently. The district court did not impose a fine but imposed a special assessment in the amount of $300.

---

[4]Defense counsel had previously made two Rule 29 motions, at the end of the government's presentation of its case-in-chief and at the close of the defendant's evidence. The district court denied these earlier motions.

[5]Although the district court expressed surprise that Roland received the benefit of the two-point reduction after going to trial, it did not object to the "generosity on the probation officer's part."

II.

Roland contends that in response to the jury's query during its deliberations, the district court should have instructed that if the members of the jury found that the government entrapped Roland as to one transaction – he surmises that the question concerned the earlier January 15 count – then it must necessarily find entrapment as to the February 20 counts. Roland argues that once the government entraps an individual, any subsequent criminal acts should be deemed the consequence of the government's original enticement. He argues that the district court should have provided a supplemental instruction to that effect. The United States responds that the district court did not err in instructing the jury to consider each count separately.

"A district court's actions in responding to questions from the jury, and supplemental instructions given to the jury by the district court are reviewed for abuse of discretion." *Mitchell*, 67 F.3d at 1252. In *Mitchell*, the court confronted circumstances much like those before us. Defendant, Katherine Ann Mitchell, was charged with three counts of illegal drug possession with intent to distribute. *Id.* at 1248. Each count arose from events transpiring on three separate dates: May 15, 1993, May 25, 1993, and May 28, 1993. *Id.* at 1249-50. During deliberations following trial, the jury sent out the following note to the court: "Can entrapment be applied to one count and not to others: Re: paragraph one, page 23." *Id.* at 1251. Paragraph 23 contained a portion of the court's instructions to the jury on entrapment. *Id.* Over the defendant's objection, the district court responded "yes" to the jury's question. *Id.* The jury subsequently acquitted Mitchell of the May 15 and May 25 counts, but convicted her for the transaction occurring on May 28. *Id.* at 1252. Mitchell argued on appeal that the judge's response to the jury's question was in error and that the judge should have instructed the jury that a finding of entrapment as to the earlier dates necessarily

8

compelled a finding of entrapment as to the later transaction. *Id.* Relying on *United States v. Khubani*, 791 F.2d 260 (2d Cir. 1986), and *United States v. North*, 746 F.2d 627 (9th Cir. 1984), the panel concluded that although the alleged acts were "only each days apart," the district court did not abuse its discretion in directing the jury to consider each count separately. *Id.* at 1256-57.

The government asserts that *Mitchell* controls the resolution of Roland's claim. Roland responds, first, that *Mitchell* is a departure from previous Sixth Circuit cases requiring a determination of predisposition at the time the government approaches a defendant and, second, that *Mitchell* is factually distinct and ought not apply here. Preliminarily, Roland's claims proceed upon a questionable premise, that is, he chooses to impute the jury's failure to reach a unanimous verdict as to the January 15 count to its finding that he was entrapped as to that count. This assumption is misguided. There is no indication that the jury's question was in fact related to the January 15 count. Moreover, it is not clear that the reason for the jury's inability to agree on a verdict had anything to do with Roland's claims of entrapment. The theory Roland posits is not implausible, but it lacks support in the record. An equally reasonable explanation is that the jury found the evidence relating to the January 15 transaction lacking in some other way.

Even assuming Roland's assumptions are correct, his arguments regarding *Mitchell* are flawed. As to his first claim, the Sixth Circuit has rejected the proposition that because predisposition to commit crime must be determined prior to contact with government actors, any subsequent criminal actions must be attributed to government pressure. The court in *Mitchell* cited with approval the Second Circuit's language in *Khubani*, where it observed that "an initial entrapment does not 'immunize [one] from criminal liability for subsequent transactions that he readily and willingly undertook." *Id.* at 1253 (quoting *Khubani*, 791 F.2d at 264). As the Second

9

Circuit explained, following government persuasion "[a] defendant might well have found [his crime] so profitable and easy that he thereafter willingly continued it, regardless of [the] original inducement." *Khubani*, 791 F.2d at 264 (internal quotation marks omitted). In the instant case, there was sufficient time present between the initial drug sale on January 15 and the second sale on February 20, that, even if the jury did believe Roland to be entrapped on January 15, it could nevertheless reasonably conclude that Roland developed a predisposition in the interim. *See United States v. Vaughn*, 80 F.3d 549, 552 (D.C. Cir. 1996) ("[A] person who is not disposed to a commit a crime today might develop a disposition to do so at some point in the future.").

In addition, Roland asserts that *Mitchell* is factually distinct because, here, Roland did not "readily and willingly undertake the sales." (Appellant's Br. at 6.) However, this argument assumes the adoption of Roland's version of the facts. The jury could have chosen to adopt the government's position and, based upon the evidence provided, concluded that Roland was in fact ready and willing to undertake the drug sales for which he was charged. To the extent the jury adopted the government's account, Roland is much like the defendant in *Mitchell*.

In light of the foregoing, we conclude that the district court did not abuse its discretion in instructing the jury to consider the possibility of entrapment as to each count separately and reject Roland's claim on that ground.

III.

Roland also challenges the district court's denial of his Rule 29 motion. We review the district court's Rule 29 decision *de novo*. *United States v. Coleman*, 458 F.3d 453, 456 (6th Cir. 2006). A reviewing court evaluates the propriety of a district court's Rule 29 ruling by considering "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

10

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005)). There is a "strong presumption in favor of sustaining a jury conviction," *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994), and a defendant seeking a judicial reversal of a jury determination of guilt bears a "very heavy" burden "because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor." *United States v.Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005).

Roland does not argue that the government failed to offer adequate evidence of the charges against him, but rather contends that the government failed to demonstrate his predisposition to commit crime beyond a reasonable doubt. Where a defendant argues entrapment, the government is obligated to establish, beyond a reasonable doubt, both that the defendant was inclined to commit the crime charged and that the defendant's inclination arose independent of the actions of the government. *See United States v. Kussmaul*, 987 F.2d 345, 349 (6th Cir. 1993). The panel may not overturn the jury's verdict on this issue absent a determination that no reasonable juror could have concluded beyond a reasonable doubt that Roland was predisposed to violate the law. *United States v. Jennings*, 945 F.2d 129, 133 (6th Cir. 1991). Relevant factors in determining inclination include: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government. *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991).

11

These factors, in light of the evidence before the jury, collectively confirm that the district court's denial of Roland's Rule 29 motion was not in error. Although Roland did not have a substantial criminal record prior to the events at issue in this case, he did engage in the sale of narcotics for personal profit. Moreover, although Roland testified that he engaged in the activities as a result of his desperate need for money, there was sufficient evidence to sustain a reasonable juror's conclusion that Roland was predisposed to engage in the activities for which he was convicted. Indeed, the government offered evidence that Roland's involvement in unlawful drug distribution preceded any contact from the government. According to the government's witnesses, Roland repeatedly referred to having a usual or regular supplier, suggesting that he had longstanding connections to individuals trafficking in illegal narcotics independent of the government's involvement. The surveillance videos provided further persuasive evidence of predisposition. They portrayed Roland as an individual familiar with the language of the drug trade and possessing experience therein. The video also showed Roland describing his girlfriend's destruction of a half ounce of crack that he had left "laying around" and a scale used to weigh drugs after discovering his romantic involvement with another woman. A juror could have reasoned that this event and Roland's possession of the discarded drugs occurred prior to the government-run undercover operation and absent any government coercion. Even the district court noted the significance of the videotapes, observing at sentencing, "[T]o be blunt, when I see you in court and see the films in this case, I see two different people. I think there is a bit of denial taking place in this case."

The jury could have reasonably rejected Roland's claims regarding the absence of predisposition, refusing to credit the testimony of the numerous character witnesses Roland presented or concluded that the individuals simply lacked awareness of Roland's illegal activities.

12

Moreover, the jury had an adequate basis for disbelieving Roland's insistence that the behavior depicted on the video was part of a ruse to lead Ozbolt to believe that he was a sophisticated drug dealer.

Ultimately, the question of predisposition in this case turned on credibility determinations. The jury was faced with a choice between two versions of Roland's activities and his motivations. Because the evidence produced at trial was adequate to sustain a rational juror's conclusion beyond a reasonable doubt in favor of the government's version of events in question, we affirm the district court's denial of his Rule 29 motion for a directed verdict.

IV.

A similar analysis informs our review of Roland's complaint regarding the denial of his Rule 33 motion for a new trial. An appeals court may reverse a district court's judgment on a Rule 33 motion only upon a showing that the district court abused its discretion. *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003). The granting of a new trial is appropriate "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). A district court possesses "wide discretion" in evaluating a Rule 33 motion and may independently evaluate witness credibility and the weight of the evidence offered a trial. *Solorio*, 337 F.3d at 589 n.6. An appeals court, by contrast, "*does not* sit as a 'thirteenth juror'" to reweigh evidence or judge witness credibility. *Ashworth*, 836 F.2d at 266. It is "limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not 'preponderate heavily against the verdict' is a clear and manifest abuse of discretion." *Id.*

Although Roland offered a contrary account of the events leading up to the February 20 drug

13

sale, the government offered compelling competing evidence of predisposition, certainly sufficient to support the district court's conclusion that the evidence did not preponderate heavily against the jury's verdict. The testimony of the character witnesses Roland offered to disprove the government's claims was not so strong that it utterly undermined the government's claims of predisposition. We therefore conclude that the district court did not abuse its discretion in declining to grant Roland a new trial.

V.

Roland's challenge to his sentence on appeal is limited to the district court's refusal to grant a downward departure for conduct falling outside the heartland of offenses contemplated by the Guidelines. [6] After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), an appellate's court's review of downward departure decisions remains limited in scope. In *United States v. Puckett*, the Sixth Circuit explained that it would decline to review a district court's decision not to depart downward "unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." 422 F.3d 340, 345 (6th Cir. 2005) (internal quotation marks omitted).

The district's court recitation of the reasons for the sentence it imposed does not make entirely clear the reason for its rejection of the departure Roland sought. It is nevertheless clear that the court denied the request for a departure. After informing Roland during sentencing that it sensed "a bit of denial taking place," the court expressed its concern regarding the "financial duress" not normally present in other cases. Without addressing Roland's downward departure motion

---

[6]Although the heading in Roland's brief frames his sentencing claim as a constitutional challenge, he offers no argument to that effect.

specifically, the court stated,

> I think *when we move from the guideline factors to the statutory factors in section 3553(a)*, that these are circumstances that impact the nature and circumstances of the offense, the need for the sentence imposed and really whether or not a sentence was sufficient to meet the interests of justice, address the severity of the crime, but also to be the least amount of sentence necessary to accomplish these goals.

(emphasis added). Thus, the district court appears to have granted a variance based on the factors outlined in § 3553(a). However, Roland points to no evidence that the district court was unaware that it possessed the authority to grant the departure, and this court's precedent does not require a statement by the trial court that it was aware of its ability to depart downward. *See id.* at 346 ("The district court need not 'explicitly state that it is aware of its discretionary authority to depart downward.'") (quoting *United States v. Lucas*, 357 F.3d 599, 609 (6th Cir. 2004)). Moreover, Roland does not argue that the district court believed itself barred from granting a downward departure.

In the absence of the showing outlined above, we are empowered to review the district court's refusal only if: "(1) the sentence was imposed in violation of the law; (2) it was imposed as a result of an incorrect application of the guidelines; (3) the sentence represented an upward departure; or (4) the sentence was imposed for 'an offense for which there is no [S]entencing [G]uideline and is plainly unreasonable'" *Id.* (quoting 18 U.S.C. § 3742(a)). As none of these criteria apply to the instant case, we are without jurisdiction to review the district court's denial of Roland's request for a downward departure.

VI.

For the foregoing reasons, we affirm the judgment of the district court.